Kenneth BAKER and Steven Baker, by Next Friend Shirley CRESS, Plaintiffs,

v.

**GENERAL MOTORS CORPORATION,** Defendant.

No. 91–0991–CV–W–8.

United States District Court, W.D. Missouri, Western Division.

Nov. 7, 1994.

Courtney E. Morgan, Jr., Detroit, MI, J. Kent Emison and Robert L. Langdon of Langdon, Emison & Ross, Lexington, MO, for plaintiffs.

David Kelly, Richard A. Bowman, Bowman & Brooke, Minneapolis, MN, Sherry A. Rozell and Rodney E. Loomer of Turner, Reid, Duncan, Loomer & Patton, P.C., Springfield, MO, James W. Halbrooks, Jr., Bowman & Brooke, Minneapolis, MN, for defendant.

### OPINION AND ORDER

STEVENS, Chief Judge.

This matter is before the Court on plaintiffs' motion for sanctions for defendant's failure to provide 1241 reports predating 1988 on underhood engine compartment electrical fires. Federal Rule of Civil Procedure 37(b)(2) ("Rule 37(b)(2)") provides:

> If a party ... fails to obey an order to provide or permit discovery ... the court in which the action is pending may make such orders in regard to the failure as are just, and among others, the following:
>
> (A) An order that the matters regarding which the order was made or any other designated facts shall be taken to be established for the purposes of the action in accordance with the claim of the party obtaining the order.

On July 9, 1993, the Court entered an Order directing defendant to produce summaries of 1241 reports on non-collision, underhood electrical fires. After full hearings and considerable briefing on plaintiffs' motion for sanctions in August 1993, the Court found that its order was not fully complied with and ordered, pursuant to Rule 37(b)(2), that the following matters, which relate to the substance of the July 9, 1993 order, shall be established for the purposes of this action:

> The 1985 Chevrolet S–10 Blazer at issue in this case was defective in that General Motors placed an electric fuel pump in the fuel tank without an adequate mechanism to shut off the pump in the event of a malfunction or collision and that General Motors has been aware of this defect and hazard for many years. The fuel pump in the 1985 Chevrolet S–10 Blazer in this case continued to operate after the engine stopped upon impact.

This Opinion and Order memorializes the sanctions entered on Monday, August 9, 1993.

While the Court recognizes the severity and apparent harsh nature of its sanction, the Court is firmly convinced that the level of the punishment fairly meets the continuing and egregious nature of the violation. This sanction is unprecedented in this division, but then again, so are the actions that made it necessary. This specific sanction addresses the conduct of General Motors in relation to the non-production of all 1241's in its possession that fit the description in the July 9, 1993 Order. However, the Court's decision is informed by the tortuous discovery history in this case and the belief that General Motor's discovery practices as a whole are conducted with complete disregard for both the letter and the spirit of the Federal Rules of Civil Procedure.

### The Law

Entry of default judgment as a discovery sanction should be "a rare judicial act." *Comiskey v. JFTJ Corp.*, 989 F.2d 1007, 1009 (8th Cir.1989), quoting *Edgar v. Slaughter*, 548 F.2d 770, 773 (8th Cir.1977). However, the Supreme Court and the Eighth Circuit recognize that such a harsh remedy is appropriate when a party's failure to comply with orders of a court are attributable to

"willfulness, bad faith, or any fault of [the party]." *Societe Internationale Pour Participations Industrielles et Commerciales, S.A. v. Rogers*, 357 U.S. 197, 212, 78 S.Ct. 1087, 1096, 2 L.Ed.2d 1255 (1958); *Comiskey*, 989 F.2d at 1009. Simple negligence, inadvertence, misunderstanding or inability to comply will not merit entry of default. *Malautea v. Suzuki Motor Co.*, 987 F.2d 1536 (11th Cir.), *cert. denied*, ——— U.S. ———, 114 S.Ct. 181, 126 L.Ed.2d 140 (1993). Also, a sanction under Rule 37 must be "just" and "specifically related to the particular claim" at issue in the discovery order. *Shelton v. American Motors Corp.*, 805 F.2d 1323, 1329–30 (8th Cir.1986) (sanctions not "just" where defendant's failure to comply was due to good-faith contention that information was privileged). Finally, the court must find that plaintiffs were prejudiced by defendant's conduct. *Id.* at 1230; *Edgar*, 548 F.2d at 773.

### The Facts

*A. 1241 Reports*

■ On March 17, 1993, plaintiffs filed a motion to conduct a computer search of General Motors's corporate records. After protracted negotiations with considerable Court involvement, in May 1993 the parties agreed to, and the Court signed, an Order providing for discovery by computer search. In the first week of May 1993, plaintiffs went to Detroit, Michigan to conduct the search. As part of that process, plaintiffs requested that General Motors search for documents know as "1241's," which are essentially records of customer complaints. On May 3, 1993, plaintiffs requested 1241's involving their type of vehicle and fires, seat belts or steering column problems. They also requested 1241's on fuel line, fuel pump problems and underhood fires on all models.

On June 14, 1993, General Motors produced, pursuant to the Computer Database Search Order, a number of 1241's. However, only one involved underhood fires. This is attributable to the fact that, despite the clear wording of plaintiffs' request, General Motors unilaterally limited the scope of the search to 1241's involving only the same engine as plaintiffs'.

On June 16, plaintiffs deposed James Nelander, a General Motors employee, who testified that he had written a report on fires based on 1241 reports and that he was able to search for 1241's on an indexed computer database. Nelander Deposition, attached to Plaintiffs' Motion for Sanctions as Exhibit D. The next day, plaintiffs' counsel wrote to defendant explaining that he only received one 1241 on underhood fires and that Nelander had confirmed more must exist. Letter from J. Kent Emison, counsel for plaintiffs, to David Kelly, counsel for defendant, June 17, 1993, attached to Plaintiffs' Motion for Sanctions as Exhibit E. More 1241's were produced on June 25, 1993.

On June 28, 1993, defendant's counsel represented to plaintiffs that many of the 1241's used by Nelander may not still exist. Letter from David Kelly, counsel for defendant, to J. Kent Emison, counsel for plaintiffs, June 28, 1993, attached to Plaintiffs' Motion for Sanctions as Exhibit F. However, counsel also stated that General Motors had "broadened" their search to include the scope requested by plaintiffs and that the search should be complete by July 12, 1993.

The Court held still another discovery conference on July 9, 1993 to discuss several matters. Near the end of the meeting, the issue of 1241's arose. Defendants indicated that 1241 searches were extremely difficult and time consuming because they involved hand-searches of documents. Therefore, General Motors asked the Court to limit the scope of the required searches. After much discussion about the time pressures in the case, defendant offered that 1241's are indexed on computer and that plaintiffs could review the 1241's to determine the ones for which they would like hard copies. Based upon the consent of plaintiffs and the representations by defense counsel that the 1241 computer database was complete, the Court on July 19, 1993 ordered General Motors to produce computer summaries of the 1241's within 10 days. The Court even narrowed the scope of such summaries to non-collision underhood electrical fires.

Plaintiffs' counsel received the 1241 summaries on July 20, 1993, but the list only dated back to 1988. The list still included

over 1250 summaries. Three weeks before trial plaintiffs now had partial access to summaries of documents they should have been given, had their original request been heeded, no later than June 3 (thirty days after the original request).

Plaintiffs' counsel wrote to defendant's counsel requesting the earlier 1241's. *See* Letter from J. Kent Emison, counsel for plaintiffs, to David Kelly, counsel for defendants, July 20, 1993, attached to Plaintiffs' Motion for Sanctions as Exhibit H. Defense counsel responded the next day that 1241's earlier than 1988 do not exist due to a five-year retention policy, "Per your request today, I have confirmed that General Motors has *no* 1241 records dating before the applicable five-year retention period. We cannot produce what we do not have." Letter from David Kelly, counsel for defendant, to J. Kent Emison, counsel for plaintiffs, July 21, 1993, attached to Plaintiffs' Motion for Summary Judgment as Exhibit J.

Plaintiffs designated 1241's they wanted hard copies of on July 20. On July 26, 1993, defendant's counsel told plaintiffs that the requested 1241's had not been copied, but would be available for inspection during plaintiffs' counsel's next trip to Detroit. Letter from James Hallbrooks to J. Kent Emison, July 26, 1993, attached to Plaintiffs' Motion for Sanctions as Exhibit K. Plaintiffs' counsel reviewed the documents and selected ones to be copied the next day, but there were no pre–1988 1241's included.

After learning from plaintiffs' lawyers in other General Motors cases that they had received pre–1988 1241's, plaintiffs filed this motion for sanctions on July 29, 1993.

On August 2, 1993, in a response to plaintiffs' motion and in a conference in chambers, General Motors sought to qualify its earlier blanket statement that *no* 1241's prior to 1988 exist. The new position was that there are certain exceptions to the five-year retention policy, but they are not applicable here. Documents are held past five years only if there is a hold order due to legal proceedings or certain National Highway Transportation Safety Administration (NHTSA) investigations. *See* Transcript of A Conference in

Chambers Before the Honorable Joseph E. Stevens, Jr., August 2, 1993.

On August 4, 1993, plaintiffs filed a second supplemental memorandum in support of their motion. In it, plaintiffs reveal that they recently discovered that pre–1988 1241 reports concerning engine compartment fires were contained in three NHTSA investigation records. Pursuant to General Motors' internal policies, all information submitted to the NHTSA is retained by General Motors. This applies to the 1241's at issue here. *See* Plaintiffs' Second Supplemental Memorandum in Support of Motion for Sanctions.

On August 5, 1993, plaintiffs received 165 pre–1988 1241's relating to underhood fires in engines substantially similar to the one in the Shoemaker blazer. *See* Plaintiffs' Third Supplemental Memorandum in Support of Motion for Sanctions. Plaintiffs procured these not through defendant, but through the NHTSA. Defendants then searched their own records and discovered 1241's they claimed did not exist. They copied over 500 responsive pre–1998 1241's and delivered them to plaintiffs' counsel on Saturday, August 7, 1994, two days before trial. *See* Defendant's Suggestions in Response to Plaintiffs' Second and Third Supplemental Memoranda.

### B. Late Production of Documents

The nonproduction of the 1241's is indicative of much of General Motors's production in this case. The transcript of the August 2, 1993 Hearing, pp. 8–12, gives numerous examples of the types of critical documents that were "dumped" on plaintiffs the week before trial. As one particularly egregious example, plaintiffs had been fighting for months to receive copies of complaints in other lawsuits against General Motors involving similar issues. In late July, plaintiffs received copies of some complaints from General Motors. One was a pleading from a car crash case that did not contain General Motors as a party. Plaintiffs discovered in early August that the complaint produced by General Motors was the original complaint filed before General Motors was joined as a party. The case involved a post-collision fire, and the amended complaint alleged products liability

based on a defective fuel pump that continued to run after the accident. *See* August 2, 1993 Transcript, at 8. Plaintiffs received the amended complaint in this case days before trial, far too late to investigate whether this case had any issues relevant to the Baker case. As of the August 2, 1993 hearing, there were still many other documents that had not been produced.

Two days before the August 9, 1993 trial date, defendant served on plaintiffs two full boxes of documents responsive to previous document requests. A list of the 441 documents included in those boxes was compiled by plaintiffs, is on file with this court, and is incorporated into this opinion. Other documents were even produced *during* trial. *See* Plaintiffs' Second Motion for Default, dated August 11, 1993.

Pamela Schembri, a General Motors employee involved in production in this case, testified that documents received by plaintiffs on August 5, 1993, four days before trial, were responsive to an April 15, 1993 request for documents. *See* Transcript of August 9, 1993 hearing, at 69–71.

The transcript of the August 9, 1993 hearing makes clear the prejudice plaintiffs have suffered by the continued delay of General Motors and the failure to produce the 1241's.

While it is true that several of these documents were not *specifically* requested by plaintiffs until fairly late in the game, the Court is confident that any delay in plaintiffs' requests was caused by General Motors's delay and its failure to comply with the plain language of plaintiffs' original requests.

### C. Pattern of Willful Conduct

It is abundantly clear that throughout the history of this case, particularly in the last month, every time General Motors was required to do something, it confined the parameters of what it was required to do as much as it possibly could. It made a very restricted inquiry and came back with very little. The struggle over every discovery issue in this case is the result of General Motors refusing to produce discovery in the way it was requested by plaintiffs. Prior

lawsuits, 1241's, development documents, and the list goes on …

Every time a request was made for any document, General Motors took it upon itself to determine what scope *it* thought was relevant. *See, e.g.,* General Motors Corporation's Response to Plaintiffs' Second Request for Production of Documents, May 21, 1993. General Motors Corporation's Response to Plaintiffs' Second Interrogatories, May 21, 1993; Letter from David Kelly, counsel for defendant, to the Honorable Joseph E. Stevens, Jr., June 7, 1993, pp. 4–8 (on file in the chambers of Chief Judge Stevens). When plaintiffs refused to accept defendant's limitations, they either worked a compromise or came to this Court. *See, e.g.,* Letter from J. Kent Emison, counsel for plaintiff, to David Kelly, counsel for defendant, June 10, 1993 (on file in the chambers of Chief Judge Stevens). That happened time and time again. Some instances are shown as conferences or hearings on the record. Many were informal or telephone contacts between this Court and counsel for the parties. None were ex parte.

Throughout this litigation and in the face of General Motors' continual protestations, the Court has stood by the principle in Fed. R.Civ.P. 26(b) that admissibility is not the standard for discovery, as General Motors continues to suggest. The standard is *whether the request is reasonably calculated to lead to the discovery of admissible evidence.* General Motors' conduct has repeatedly and consistently frustrated both the spirit and the letter of this Rule and others.

The Court finds, based on the record in this case and the hearings on this matter, that General Motors's misconduct in this case has been willful and has been a result of its own acts. Although General Motors continues to insist that its failure to discover the NHTSA 1241's was no more than an oversight, the Court believes that the omission was due to an intentional and systematic discovery policy whereby General Motors reads discovery requests impermissibly narrowly to avoid production until the requesting party or the Court forces such production. In the case of the 1241's, those found in the NHTSA files were not found previously because General Motors constructs a nar-

row view of where it must look to find discoverable material. The Federal Rules of Civil Procedure anticipate that materials held by a corporation will be produced no matter where they are. General Motors has created a set of discovery blinders by creating a corporate central file and refusing to conduct searches outside of that repository until a requesting party formulates the "magic words" necessary to trigger a search of other files. The 1241's at issue are no less discoverable because they are located in a different file. General Motors's failure to find them was not because of a simple mistake, but because of the institutional system that discourages open and fair discovery.

General Motors argues that the failure to find the 1241's in the NHTSA was the result of negligence at most. Were it not for the egregious discovery conduct that pervades the rest of this case, the Court might be persuaded to agree. However, the pattern of conduct established in this litigation convinces the Court that oversights such as this were the result of a deliberate, willful policy on the part of General Motors to stonewall discovery as much and as long as the patience of the Court would tolerate. Furthermore, the litigation surrounding this sanctions has been shell game of constantly shifting answers. First, defendant claimed pre-1988 1241's did not exist. Then, they claimed that certain ones do exist that are subject to hold orders. At the hearing, they were forced into a fallback position that they had no idea that 1241's existed in the NHTSA files. The Court has exposed General Motors' three shells and finds nothing of merit under any of them.

General Motors also argues that it was not required to produce the NHTSA 1241's under any order of the Court because the July 9, 1993 order only directed General Motors to turn over "computer summaries" of 1241's. Since these 1241's were not on the computer, General Motors argues it cannot be sanctioned for failure to produce them. The July 9, 1993 order referred only to computer summaries because defendant's counsel represented to the Court that all 1241's that General Motors could produce in hard copy were indexed on the computer database. And the

only reason an order was necessary was because General Motors refused to produce the 1241's as originally requested on May 3, 1993. General Motors will not be allowed to escape sanctions for defalcations caused by their own representations.

As a final resort to defend the late discovery, General Motors points to the fact that there was a corporate shutdown from July 19, 1993 until August 2, 1993. General Motors submits that the corporate shutdown justifies the delays here. The Court will not accept the argument that the Fortune 500's largest corporation could not provide someone during this time to process discovery requests. General Motors may have shut down from July 19 until August 19, but the Judicial Department of the United States and this Court did not. The August 9, 1993 trial date was not a well-kept secret. General Motors was well-aware of that date and by its own conduct, was well-aware of the tremendous amount of outstanding discovery. A corporate vacation will not be used to mask a defiant refusal to comply with discovery orders.

Based upon General Motors' willful and systematic conduct, the Court finds that sanctions are not only warranted, but mandated to deter this type of conduct.

### Sanctions in Other Courts

Sanctions of default are expressly permitted by rule and have is routinely upheld by appellate courts.

Perhaps the most helpful recent case on this issue is found in *Malautea v. Suzuki Motor Corp.*, 987 F.2d 1536 (11th Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 181, 126 L.Ed.2d 140 (1993). In *Malautea*, the district court found that defendant had engaged in bad faith and intransigent discovery procedures. As in the present case, the Suzuki's transgressions were repeated and continuous. In fact, Suzuki's acts bear a striking resemblance to the occurrences here. Defendant answered discovery requests by always limiting its answer to a class a vehicle of their own choosing, thereby limiting the reach of plaintiffs' requests to those documents Suzuki wished to produce. 987 F.2d at 1540. Suzuki balked at definitions used by

plaintiff, calling them overbroad and ambiguous and refusing to answer requests employing the definitions. *Id.* Defendants also repeatedly delayed producing specific documents after being requested and then ordered to do so. *Id.* Finally, Suzuki claimed ignorance of a specific set of documents that plaintiffs later acquired from an outside source. *Id.* at 1540–41. The district court judge found Suzuki's acts to be willful and in bad faith and in violation of specific discovery orders. Upon motion of plaintiffs, he struck defendant's answers and entered default on liability as this Court did here. The court in *Malautea* also imposed monetary sanctions and awarded attorney fees. *Id.*

The defendants appealed to the Eleventh Circuit, arguing that (1) the discovery orders did not encompass the information secured from the outside source; (2) that the discovery orders were vague or ambiguous; (3) that noncompliance was due to misunderstanding; and (4) that the sanctions imposed were unduly harsh because there was no pattern of abuse and the actual defense was meritorious. *Id.* at 1542. The Eleventh Circuit affirmed the trial court, finding that the sanctions were well within the judge's discretion and that the sanctions were "richly deserved." *Id.* The Supreme Court denied certiorari. — U.S. ——, 114 S.Ct. 181, 126 L.Ed.2d 140 (1993).

Sanctions of this sort are not new to the Western District of Missouri either. In *Bollard v. Volkswagen of America, Inc.,* 56 F.R.D. 569 (W.D.Mo.1971), Judge William H. Becker entered default judgment on liability against the defendant for failure to provide adequate and timely discovery.

In *Hogue v. Fruehauf,* 151 F.R.D. 635 (C.D.Ill.1993), another District Court judge, faced with the same type of recalcitrant discovery behavior as this Court has witnessed, ordered the same penalty:

> The very integrity of the civil justice system depends on compliance with the discovery rules. Discovery cannot be a game of hide-and-seek. Our discovery system depends in large part on self-reporting. When discovery requests are made by a party, the party [of] whom the request is made has an obligation to respond accurately and fully.

> The magnitude and type of interference with the discovery process here constitutes an obstruction [of] the Court's management of civil cases and a substantial obstruction [of] the public's interest in the expeditious and just resolution of litigation. In one sense, the Court is reluctant to impose the penalty of default on the issue of liability as a sanction, because the Court fully supports the proposition that claims should be determined on their merits. In this case, however, [defendant's] conduct can, at best, be characterized as involving a callous disregard for its responsibilities owed to the Court, to the public, and to the Plaintiff in this case.

*Hogue v. Fruehauf,* 151 F.R.D. at 639–40.

The Supreme Court has also recognized that sanctions serve not only a punitive role, but a deterrent one as well; "the most severe in the spectrum of sanctions provided by statute or rule must be available to the District Court in an appropriate case, not merely to penalize those whose conduct may be deemed to warrant such a sanction, but further to deter others who might be tempted to such conduct in the absence of such a deterrent." *National Hockey League v. Metropolitan Hockey Club,* 427 U.S. 639, 640, 96 S.Ct. 2778, 2780, 49 L.Ed.2d 747 (1976).

This judge has been practicing law for forty-one years and has witnessed great changes from the ways giant corporations used to take advantage of the Court, the system, and the parties on the other side of discovery. It was a different ball game in those days. However, this judge has spent a considerable portion of the last five years serving as a member of the Advisory Committee on Civil Rules of the Judicial Conference of the United States. The principal work of that committee during these years was to take serious steps towards making litigation quick, less onerous and less expensive for the parties and more reflective of the underlying truth that there is in the scenario represented by the facts. General Motors' conduct in this case represents a clash of the ways of the past with the rules of the present. Unfortunately for the defendant, the

rules of the present have the force of law on their side.

There is no doubt that the discovery in this case has been extraordinarily expensive and we do not have to look very far to explain that fact. Through the long discovery history in this case, the parties have held numerous conferences in person and by telephone. From the beginning, this Court tried to relate to defense counsel and through them to their client that trial by ambush or by delay is no longer acceptable in federal court, and certainly not in the Western District of Missouri. At the very first discovery conference in 1992, the Court instructed defense counsel to send a photocopy of Rule 37 to the defendant, because this Court will not permit the biggest best-funded party to win solely because they can hold out the longest. It is clear by the proceedings reflected in the entire record of this case that this Court's warning was not heeded. General Motors clearly believed that it should do all in its power to wear the plaintiffs out through a litigation strategy of feast and famine. Plaintiffs were forced to starve on incomplete discovery responses during the early part of the case, and then feast on thousands of documents on the eve of trial. Although it is a strategy that may well assure a defense victory if permitted to go unchecked, this Court will not allow such tactics to tip the scales of justice.

Throughout this process, in this case and in others before this same Court, General Motors has depended on "technical" explanations of its repeated failure or delay in producing discovery. Every request for discovery has been met with an objection to breadth or scope. General Motors believes that it need only produce discovery it believes is relevant or that it believes fits within its own narrow readings of discovery requests. General Motors will only produce what it wants to produce, not what it is required to produce. The 1241 incident may be one "technical" failure to produce, but it is a damning example of General Motors' wider and intransigent discovery attitude.

Decisions from other jurisdictions support the conclusion that General Motor's conduct in this case is the standard rather than the exception. In *Cooper v. General Motors*, No. 25459 (Mich. Circuit Court February 9, 1993), judge Edward A. Quinnell stated, in entering default against General Motors, "The failure to provide this information is unexplainable and I just cannot understand how General Motors with a straight face can claim they are trying to get the judicial process to work. It's just not happening."

In *Moseley v. General Motors*, former General Motors engineer Ronald Elwell testified about "G.M.'s practice of giving elusive answers to interrogatories, 'woodshedding' engineers who testified, and incomplete searches of engineering files in response to discovery requests." 213 Ga.App. 875, 447 S.E.2d 302 (1994). The Court notes this testimony because it squares perfectly with the type of discovery that was made (or not made) in the instant case. Other decisions reflecting General Motors' unacceptable discovery practices are accumulating rapidly. *See, e.g., Cameron v. General Motors*, 1994 WL 159408, Civ.A. Nos. 6:93–1278—1279 (D.S.C. February 28, 1994, George Ross Anderson, J.); *Stump v. Burlington Northern Railroad and General Motors*, No. 91–C–09 (Kan.Dist.Ct., August 17, 1992, Thomas Tuggle, J.); *McGuire v. American Family Mut. Ins. and General Motors*, No. 719–169 (Wisc.Cir.Ct., May 3, 1991, Francis T. Waselewski, J.); *Sulenski v. General Motors*, 1988 WL 6520 (Ohio App.1988); *Kennedy v. General Motors*, 1985 WL 4664 (Ohio App.1985); *General Motors v. Aetna Casualty and Surety Co.*, 573 N.E.2d 885 (Ind.1991); *Shephard v. General Motors*, 42 F.R.D. 425 (D.N.H. 1967); *Klitsch v. General Motors*, 1990 WL 192037 (E.D.Pa.1990); *Carlson v. General Motors*, 9 Ill.App.3d 606, 289 N.E.2d 439 (1972). Although this list is not exhaustive, it leaves this Court with the unmistakable impression that General Motors "just does not get it." Despite repeated reprimands of differing degrees of severity, General Motors still engages in the practices witnessed by this Court. Based on the facts given in many of these cases, it becomes very clear that General Motors's activities are not isolated occurrences or unfortunate miscommunications. The cited cases further reinforce the Court's determination that General Mo-

tors's discovery policies are designed to turn over the least amount of information with the greatest difficulty to the opponent and that the sanctioned activities here are not simple accidents.

In this judge's many years on the bench, the discovery conduct in this case stands out as the most egregious. It is not coincidental that its only rival is another case in which General Motors was a defendant, *Ballard v. General Motors*, No. 91–1148–CV–W–8. In that case, too, plaintiffs filed a motion for sanctions because of defendant's seriously delinquent and noncompliant discovery. Although the case settled before the sanctions issue was completely resolved.

This Court believes that only by taking bold and judicious action will General Motors learn what it has failed to learn through the written rules, informal and on-the-record suggestions, and milder forms of sanctions. This Court's action is designed and measured primarily to sanction defendant's conduct in relation to the 1241 reports and to remedy the harm caused to plaintiffs' pretrial preparation because of the defendant's inexcusable conduct and delay.

The Court also intends this action to be a firm message to General Motors in particular, and all other unwary parties and their counsel, that discovery in Division Eight of the Western District of Missouri will proceed within the spirit and letter of the Federal Rules of Civil Procedure. Cat and mouse games and trial by ambush by any party will not be tolerated. This Court will continue to use all means at its disposal to ensure that all pretrial discovery is full, fair and open, and is conducted in a timely and cost-effective matter. Conduct that frustrates these goals will not be permitted.

While this Court is a firm believer in allowing a trial to proceed on the merits, General Motors's conduct has prevented plaintiffs from properly divining the merits of their case. Therefore, the Court finds that entry of sanctions is appropriate in this case to punish General Motors for past conduct and deter future noncompliance.

## The Sanction

As discussed above, the Court finds that defendant's conduct satisfies the dictates of *Societe Internationale Pour Participations Industrielles et Commerciales, S.A. v. Rogers*, 357 U.S. 197, 212, 78 S.Ct. 1087, 1096, 2 L.Ed.2d 1255 (1958) for the imposition of default judgment as a sanction. The failure to comply with Court orders was due to the act of the party itself and was willful.

■ The Court must tailor the sanction to fit the violation by weighing the nature of the defendant's conduct and the prejudice caused to plaintiff. In this case, defendant's discovery policies have resulted in innumerable delays, considerable expense, and ultimately, severe prejudice on the eve of trial as plaintiffs struggled to digest and interpret a flood of last minute discovery. Defendant claims that the nonproduction of the 1241 reports at issue could not possibly be prejudicial because the reports are in no way relevant to the case and none would be admissible at trial. That position misses the entire point of the discovery process. Documents may not be admissible themselves but may supplement or augment counsel's knowledge of other matters. Had plaintiffs seen the 540 1241 reports and the rest of the documents in the two full boxes sooner than two days before trial, it is possible they may have been deemed irrelevant. However, on the eve of trial, counsel for plaintiffs was under no obligation to accept defendant at its word that the documents were not relevant. At a time when trial lawyers should be rehearsing opening statements, preparing witnesses and finishing jury instructions and motions in limine, plaintiffs' counsel were required to pour through reams of delinquent documents. Plaintiffs were prevented from preparing for trial in general, and in particular, from solidifying their evidence on the issue of liability. The prejudice in this is complete and obvious. Defendant's conduct in regards to the 1241's and all other documents produced immediately preceding trial prevented plaintiffs from preparing adequately for trial. The only way to remedy the prejudice suffered by plaintiffs is to grant judgment in their favor on the issue that General Motors

has prevented them from trying fairly. Pursuant to Rule 37(b)(2), it is

ORDERED that defendant's affirmative defenses as raised in its answer are STRICKEN. It is further

ORDERED that the following matters, which relate to the substance of the July 9, 1993 order, shall be established for the purposes of this action:

The 1985 Chevrolet S–10 Blazer at issue in this case was defective in that General Motors placed an electric fuel pump in the fuel tank without an adequate mechanism to shut off the pump in the event of a malfunction or collision and that General Motors has been aware of this defect and hazard for many years. The fuel pump in the 1985 Chevrolet S–10 Blazer in this case continued to operate after the engine stopped upon impact.