_____

No. 95-1604
_____

Kenneth Lee Baker; Steven    *
Robert Baker, by next friend,  *
Melissa Thomas,            *
                     *
      Appellees,       *  Appeal from the United States
                     *  District Court for the Western
  v.               *  District of Missouri.
                     *
General Motors Corporation,   *
                     *
      Appellant.       *
                     *
_____      *
                     *
The Product Liability      *
Advisory Council, Inc.,     *
                     *
      Amicus Curiae.     *
                _____

Submitted: January 8, 1996

Filed: June 14, 1996
_____

Before BEAM, MORRIS SHEPPARD ARNOLD, Circuit Judges, and ALSOP,[*] District
    Judge.
_____

BEAM, Circuit Judge.

    In this products liability action, General Motors Corporation (GM)
appeals a jury verdict in favor of plaintiffs for 11.3 million dollars.
GM argues that the district court erred in: (1) entering a discovery
sanction against it; (2) instructing the jury on punitive damages; and (3)
allowing a former GM employee to testify at deposition and trial.  We
reverse.

---

    [*]The HONORABLE DONALD D. ALSOP, United States District
    Judge for the District of Minnesota, sitting by
    designation.

## I.   BACKGROUND

This case arose out of an automobile accident in which Gerald Shoemaker and Beverly Garner were killed.  Shoemaker and Garner collided head-on with another car after which a fire broke out in the engine compartment of their vehicle.  Garner's sons, Kenneth and Steven Baker, brought this products liability action alleging that the engine fire was caused by a faulty fuel pump in the Chevrolet S-10 Blazer in which their mother was riding and that this defect caused her death.  GM asserted that the fuel pump was neither faulty nor the cause of the fire and that instead, Garner died as a result of collision impact injuries.

As in any products liability case, the cornerstone of the plaintiffs' case is the product's defect.  To help prove that defect, the plaintiffs asked GM to produce its 1241 reports (1241 reports are essentially complaints from customers regarding GM products) involving similar accidents.  GM represented that all 1241 reports were indexed in summary form in its central computer file.  GM stated that its customary response to discovery requests was to produce these 1241 summaries instead of the actual 1241 reports.  From these summaries, plaintiffs could request the specific 1241 reports in which they were interested.  Both the 1241 summaries and the reports proved difficult to obtain from GM and were the source of several discovery disputes during the months before trial.

On July 9, 1993, after several discovery stalemates, the district court issued an order which directed GM to produce "summaries of 1241 forms on non-collision under-hood electrical fires within 10 days" of the order. On July 20, GM produced a group of computer summaries, none predating 1988. GM stated that pre-1988 reports were no longer available due to a five-year retention policy and that its production, therefore, amounted to full compliance with the July 9th order.

After learning from other plaintiffs' attorneys in other GM cases that they had received 1241 reports which were allegedly over five years old, the plaintiffs asked the district court to sanction GM for what they believed to be abuses in the discovery process. On August 2, GM explained that although there were several exceptions to its five-year retention policy, none of these exceptions had resulted in the retention of any 1241 reports (or summaries) over five years old which were relevant to this case.

A few days later, the plaintiffs found more 1241 reports over five years old in a National Highway Transportation Safety Administration (NHTSA) file. The file had been compiled by the NHTSA during one of its investigations into possible automobile defects. The plaintiffs then supplemented their request for sanctions against GM. This time, GM stated that it had never occurred to anyone to search the NHTSA files for older 1241 reports and cited the public availability of the reports to justify its lack of production. GM did, however, expand its records search at this time. Two days before trial, GM produced another five hundred 1241 reports, some of which duplicated those found in the NHTSA file. GM claimed, however, that few of these reports were responsive to the July 9th order. Following this production, the district court granted the plaintiffs' request for sanctions against GM.

Noting GM's continuing delay in the discovery process, the district court ordered GM's affirmative defenses stricken and further ordered that:

> the following matters, which relate to the substance of the July 9, 1993 order, shall be established for the purposes of this action:
>
> The 1985 Chevrolet S-10 Blazer at issue in this case was defective in that General Motors placed an electric fuel pump in the fuel tank without an adequate mechanism to shut off the pump in the event of a malfunction or

collision and that General Motors has been aware of this defect and hazard for many years. The fuel pump in the 1985 Chevrolet S-10 Blazer in this case continued to operate after the engine stopped upon impact.

Baker v. General Motors Corp., 159 F.R.D. 519, 528 (W.D. Mo. 1994) (Baker I). The case proceeded to trial on the sole issue of whether the defect in the 1985 Chevy Blazer "directly caused or directly contributed to cause" the death of Beverly Garner. Trial Trans. at 1725.

At trial, the plaintiffs called former GM employee, Ronald Elwell, to testify.[1] Prior to trial, Elwell's testimony had been the subject of much debate. Elwell and GM had been involved in an earlier employment dispute which had led Elwell to sue GM for wrongful discharge. GM counterclaimed, alleging that in testifying for various plaintiffs (and against GM) in other products liability actions, Elwell was divulging privileged information. In settling the wrongful discharge claim, Elwell consented to a Michigan injunction which barred him from testifying against GM in products liability cases. GM and Elwell also entered into a settlement agreement[2] memorializing, among other things, their monetary settlement and GM's desire to prevent future damaging testimony by Elwell. The settlement agreement provided, in part, that if Elwell were ordered to testify by a court or other tribunal, he could do so without violating the settlement agreement.

---

[1]For 15 of his 30 years of credited service with GM, Elwell was a member of GM's Engineering Analysis staff which studied the performance of GM vehicles, especially those involved in products liability litigation. Based on this experience, Elwell had assisted GM lawyers in defending products liability actions.

[2]Although the settlement agreement was sealed by the court below, we make use of the agreement to the extent necessary for our preparation of this opinion.

In this case, GM strenuously objected to both Elwell's deposition and trial testimony contending that Elwell's testimony was barred by the Michigan injunction.  The plaintiffs countered that the Michigan injunction was not entitled to full faith and credit by the district court.  Alternatively, they argued that even if the injunction were entitled to such credit, the settlement agreement allowed Elwell to testify.  After in camera review of the Michigan injunction and the settlement agreement, the district court allowed the plaintiffs to depose Elwell and to call him as a witness at trial.

Elwell's trial testimony concerned his research on fuel-fed engine fires and the existence and contents of the "Ivey" document.  The Ivey document is a value analysis document prepared by Edward Ivey, an Advance Design employee, and allegedly circulated among selected top GM and Oldsmobile officials.  The Oldsmobile officials, according to Elwell's testimony, were at that time responsible for the overall fuel system design of GM vehicles.  The document analyzed the potential expense of the loss of human life per vehicle due to fuel-fed engine fires.  According to Elwell, the analysis implied that it would be worth only $2.40 per vehicle in operation for GM to prevent such fuel-fed fires.

At the end of trial, the district court incorporated its Rule 37 sanction language into the jury instructions.  The district court also instructed the jury as to both compensatory and aggravating circumstance damages.[3]  GM objected to the jury

_____

[3]The only explanatory damages instruction given, as to either type of damages, read in relevant part:

> In determining what amount would be fair and just compensation in this case you may consider the pecuniary losses suffered by reason of the death and the loss of companionship, comfort, instruction, guidance, counsel, training and support which decedent provided to Kenneth Baker and Steven Baker if any such loss or losses are found by you.  In addition, you may award such damages as

Beverly Sue Garner may have suffered between the time of injury and the time of death and for the recovery of which the deceased may have maintained an action had death not ensued.  You may consider any mitigating or aggravating circumstances attendant upon the

-5-

instructions, arguing, <u>inter alia</u>, that the instructions gave the jury insufficient guidance in awarding what were essentially punitive damages.[4] GM also objected to the lack of differentiation between compensatory and punitive damages in the verdict form. Following trial, the jury awarded the plaintiffs 11.3 million dollars in damages, without apportioning between compensatory and aggravating circumstance damages.

## II. DISCUSSION

### A. The Discovery Sanction

GM argues that the district court abused its discretion in entering the discovery sanction. The district court has broad discretion in issuing sanctions for discovery abuse and its decision will be upheld absent an abuse of discretion. <u>Anderson v. Home Ins. Co.</u>, 724 F.2d 82, 84 (8th Cir. 1983) (citing <u>Fox v. Studebaker-Worthington, Inc.</u>, 516 F.2d 989 (8th Cir. 1975)). Our scope of review of the district court's actions is, therefore, very narrow. <u>Prow v. Medtronic, Inc.</u>, 770 F.2d 117, 122 (8th Cir. 1985).

---

death if you find any such circumstances. You may not consider grief and bereavement by reason of the death.

Trial Trans. at 1727.

[4]GM's objections included the following claims: (1) there was inadequate evidence to support the submission of an aggravating circumstance damages instruction to the jury; (2) the lack of evidence of aggravating circumstance damages denied GM the opportunity to defend against such damages; (3) the jury was given insufficient standards for imposing aggravating circumstance damages through vague and unconstitutional instructions; and (4) the failure to apportion between compensatory and aggravating circumstance damages was error.

We must first determine whether the district court was correct in finding a discovery violation to support its imposition of the sanction under Federal Rule of Civil Procedure 37 (Rule 37). To impose Rule 37 sanctions, there must be: (1) a court order compelling discovery; (2) a violation of that order which is wilful;[5] and (3) prejudice to the other party from the violation. Shelton v. American Motors Corp., 805 F.2d 1323, 1330 (8th Cir. 1986); Edgar v. Slaughter, 548 F.2d 770, 772 (8th Cir. 1977). In this case, all of these elements were present.

The July 9th order satisfies the first requirement, that there be a discovery order in place. GM failed to fully comply with the order within the ten-day required period, as evidenced by its further production of 1241

---

[5]Severe sanctions, such as that entered here, are often reserved for wilful or bad faith violations of court orders. Societe Int'l v. Rogers, 357 U.S. 197, 212 (1958). This court has determined, however, that a "deliberate default" will suffice. Anderson, 724 F.2d at 84 (citing Lorin Corp. v. Goto & Co., 700 F.2d 1202, 1208 (8th Cir. 1983) (deliberateness includes failure to respond to discovery requests and failure to provide full information following a court order)). In any event, we agree with the district court's conclusion that GM's noncompliance was both deliberate and wilful. Baker I, 159 F.R.D. at 524.

reports in early August, just prior to trial.[6]  The district court's
finding of prejudice is supported by

---

[6]GM argues that the July 9th order only required production of
computer summaries of 1241 reports.  The district court seemed to
share that belief.  Baker I, 159 F.R.D. at 524.  However, the
express words of the order made no such limitation.  GM further
argues that it only needed to produce the summaries found on its
central computer file, because the district court and the
plaintiffs understood that to be GM's customary discovery response
technique.  Again, the discovery order contains no such limitation.
Furthermore, as the district court explained, the order "referred
only to computer summaries because defendant's counsel represented
to the Court that all 1241's that General Motors could produce in
hard copy were indexed on the computer database."  Id.  This
assurance was, at best, inaccurate.  Consequently, GM cannot now
rely on its own interpretation of the discovery order's limiting
language which was employed largely because of its own
misrepresentations.  Similarly, GM cannot feign compliance with the
discovery order by producing the actual 1241 reports, instead of
the summaries as directed by the order.

GM apparently wants this court to overturn the district
court's factual findings leading up to the imposition of sanctions.
This, we refuse to do.  See generally Dillon v. Nissan Motor Co.,
986 F.2d 263, 267 (8th Cir. 1993) (both sanction imposed under
court's inherent authority and factual basis for sanction are
reviewed under abuse of discretion standard); Laclede Gas Co. v.
G.W. Warnecke Corp., 604 F.2d 561, 565 (8th Cir. 1979) (party
subject to sanction for violating letter and spirit of discovery
rules as well as court's pretrial orders).  GM cannot take a
limited view of its duty to comply with discovery requests simply
because it is customary for it to do so.  GM was ordered to produce
the summaries because they were supposed to lead to the production
of all available 1241 reports.  Because GM's assurance failed, so
does its interpretation of the discovery order.

the produced documents themselves. GM's late production of the 1241 reports prevented the plaintiffs from researching them completely, essentially depriving them of the information which they were due. GM's conduct, therefore, clearly justified the imposition of Rule 37 sanctions. However, this conclusion does not end our inquiry. We must determine whether the sanction imposed was just and specifically related to the claim at issue in the discovery order. See Fed. R. Civ. P. 37(b)(2); Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 707 (1982). In this case, we do not believe the sanction met that standard.

As this court has stated previously, "[t]here is a strong policy favoring a trial on the merits and against depriving a party of his day in court." Fox, 516 F.2d at 996. The sanction in this case failed to achieve a balance between the policies of preventing discovery delays and deciding cases on the merits. Such a balance recognizes that the opportunity to be heard is a litigant's "most precious right and should be sparingly denied." Edgar, 548 F.2d at 773. GM was not given the right to be heard. Instead, the jury was asked, essentially, to place a monetary value on the loss of human life. Before issuing such a sanction, fairness required the court to consider whether a more "just and effective" sanction was

available.  Id.  In this situation, other, less severe sanctions (including monetary fines against GM and continuances for the plaintiffs) were both available and appropriate.

While we do not condone GM's failure to meet its discovery obligations, we find that the sanction chosen by the district court was simply too severe for the facts presented and should have been drawn more narrowly.  See English v. 21st Phoenix Corp., 590 F.2d 723, 728 (8th Cir.), cert. denied, 444 U.S. 832 (1979).  By providing that the fuel pump was defective and continued to operate here, the sanction forced the jury to find for the plaintiffs.  Although the case ostensibly proceeded to trial on the issue whether the defect "directly caused or directly contributed to cause" Garner's death, in effect, the jury instructions had already decided the matter for the jury.  Because the district court abused its discretion in entering such a broad sanction, we reverse for imposition of a lesser sanction and for a new trial.

## B.    The Aggravating Circumstance Instruction

GM also argues that aggravating circumstance damages under Missouri law are in fact punitive damages and that it was subjected to such damages without the procedural safeguards required by Pacific Mut. Life Ins. Co. v. Haslip, 499 U.S. 1 (1991).  Because we reverse on the issue of liability, we must vacate the award of damages.  However, we address this issue to avoid error on retrial.[7]

---

[7]In so doing, we acknowledge the United States Supreme Court's recent decision in BMW of North America, Inc. v. Gore, 1996 WL 262429 (U.S. May 20, 1996) (reversing "grossly excessive" punitive damages award as violative of Fourteenth Amendment's Due Process Clause).  Although that decision does not affect this analysis, the district court may wish to consider its teachings on remand.

Pursuant to the Missouri Supreme Court's recent decision in <u>Bennett v. Owens-Corning Fiberglas Corp.</u>, 896 S.W.2d 464 (Mo. 1995), there is no question that Missouri's aggravating circumstance damages are to be treated as punitive damages. The Missouri Supreme Court not only equated aggravating circumstance and punitive damages, but further stated, "[a]t least since 1979, the damages attributed to `aggravating circumstances' necessarily refers only to punitive damages." <u>Id.</u> at 466. In other words, <u>Bennett</u> did not signal a change in the law, but merely clarified the law as it had existed for quite some time in Missouri.[8] As the <u>Bennett</u> court stated, "[b]ecause aggravating circumstance damages are punitive in nature, they may only be awarded if accompanied by the due process safeguards as articulated in <u>Haslip</u>." <u>Bennett</u>, 896 S.W.2d at 466. Consequently, we must examine whether the <u>Haslip</u> safeguards were met in this instance.

---

[8]Consequently, we find the appellees' argument that <u>Bennett</u> should only be given prospective application unavailing. Even if we found that <u>Bennett</u> announced a new principle of law, which we do not, we would apply the <u>Bennett</u> decision retroactively. <u>See</u> <u>Chevron Oil Co. v. Huson</u>, 404 U.S. 97, 106-07 (1971); <u>Elliot v. Kesler</u>, 799 S.W.2d 97, 102 (Mo. Ct. App. 1990). Under <u>Chevron</u>, a decision is to be given prospective application only if: (1) it established a new principle of law; (2) its retroactive application would retard its operation; and (3) its retroactive application would produce inequitable results. <u>Chevron</u>, 404 U.S. at 106-07. In this case, we find that <u>prospective</u> application of <u>Bennett</u> would produce inequitable results. The United States Supreme Court's decision in <u>Haslip</u>, with which the instructions in this case failed to comply, preceded, by two years, the trial of this case. <u>Haslip</u>, 499 U.S. at 1. To approve of, in hindsight, proceedings which were clearly in violation of Supreme Court precedent at the time of their occurrence, would be inequitable. Furthermore, we find, as would Missouri courts, that because <u>Bennett</u> clarified applicable substantive law, not merely procedural law, it should be given retroactive effect. <u>See</u> <u>Dietz v. Humphreys</u>, 507 S.W.2d 389, 392 (Mo. 1974); <u>Prayson v. Kansas City Power & Light Co.</u>, 847 S.W.2d 852, 854 (Mo Ct. App. 1992), <u>cert. denied</u>, 114 S. Ct. 95 (1993).

In Haslip, the United States Supreme Court held that the traditional means[9] of awarding punitive damages did not per se violate the Due Process Clause of the United States Constitution. 499 U.S. at 15. However, the Court cautioned that "unlimited jury discretion--or unlimited judicial discretion for that matter--in the fixing of punitive damages may invite extreme results that jar one's constitutional sensibilities." Id. at 18. The Court further stated that factfinders "must be guided by more than the defendant's net worth" in making such awards. Id. at 22. In Haslip, such guidance included: (1) jury instructions which adequately informed the jury as to the purpose of punitive damages--to punish the wrongdoer and to protect the public from similar future harms; (2) post-trial procedures in which the trial court scrutinized punitive damages awards; and (3) state supreme court review, including a comparative analysis, to ensure awards were "reasonable in their amount and rational in light of their purpose to punish what has occurred and to deter its repetition." Haslip, 499 U.S. at 19, 20, 21.

In this case, there was neither any guidance for the jury nor any restraint on its discretion in awarding punitive damages. Instead, the jury was allowed to award aggravating circumstance damages without being given a definition of what those damages entailed. This lack of guidance rendered the jury instructions unconstitutionally vague and violated GM's right to due process. See Bennett, 896 S.W.2d at 466.

The jury also did not apportion its damages award between compensatory and punitive damages, as required by Bennett. Trial

_____

[9]"Under the traditional common-law approach, the amount of the punitive award is initially determined by a jury instructed to consider the gravity of the wrong and the need to deter similar wrongful conduct. The jury's determination is then reviewed by trial and appellate courts to ensure that it is reasonable." Haslip, 499 U.S. at 15.

Trans. at 1706.  This resulted in a lump sum award of 11.3 million dollars. As GM stated in its objection to the lack of division, "the defendant under these circumstances can be punished without knowing what the punishment is since the damages are one figure."  Trial Trans. at 1705-06.  Because there is no way to compare the punitive and compensatory damages awards, GM has effectively been denied its right to trial court and appellate court review of the punitive damages award.  Therefore, the damages award was defective.

### C.    The Michigan Injunction

The constitutional full faith and credit principle requires that federal courts give the same faith and credit to a state court judgment as would the state court in which it was rendered.  U.S. Const. Art. IV § 1; 28 U.S.C. § 1738.  See also Matsushita Elec. Indus. Co. v. Epstein, 116 S. Ct. 873, 877 (1996).  GM asserts that the district court violated this principle in allowing the plaintiffs to take Ronald Elwell's deposition and in allowing him to testify at trial.  GM argues that the district court should instead have given full faith and credit to the Michigan injunction barring Elwell's testimony.  Because the district court's decision to not extend the injunction full faith and credit involves a question of law, we review it de novo.  See In re Garner, 56 F.3d 677, 679 (5th Cir. 1995); Southeast Resource Recovery Facility Auth. v. Montenay Int'l Corp., 973 F.2d 711, 712 (9th Cir. 1992).

The district court refused to give the Michigan injunction full faith and credit because it believed:  (1) a "public policy" exception to full faith and credit allowed Elwell's testimony, and (2) full faith and credit implies the same faith and credit; therefore, an injunction which is modifiable in Michigan is modifiable in Missouri.  We first address the district court's reliance on a "public policy" exception to full faith and credit.

The district court found that the Michigan injunction violated Missouri's public policy, as evidenced by Missouri's Rules of Civil Procedure, which favors full disclosure of all nonprivileged, relevant information. See, e.g., Mo. R. Civ. P. 56. Because the Michigan injunction bars Elwell from testifying even as to nonprivileged information, the district court refused to extend full faith and credit to the injunction. Assuming, arguendo, that a public policy exception to the full faith and credit command exists,[10] we conclude that the district court improperly relied on such an exception in this case because of Missouri's equally strong public policy in favor of full faith and credit.

Missouri public policy embraces the theory of full faith and credit, as evidenced by the references to it in the state's statutes. See, e.g., Mo. Rev. Stat. §§ 511.760; 511.778. Missouri case law also contains numerous discussions of the importance of the full faith and credit requirement. See, e.g., Roseberry v. Crump, 345 S.W.2d 117, 119 (Mo. 1961); In re Veach, 287 S.W.2d 753, 759 (Mo. 1956); Bastian v. Tuttle, 606 S.W.2d 808, 809 (Mo. Ct. App. 1980); Corning Truck & Radiator Serv. v. J.W.M., Inc., 542 S.W.2d 520, 524 (Mo. Ct. App. 1976). Under this doctrine, Missouri courts must give full faith and credit to judgments of sister state courts "unless it can be shown that there was lack of jurisdiction over the subject matter, failure to give due notice, or fraud in concoction of the judgment." Bastian, 606 S.W.2d at 809. No such allegations have been made in this case. It is therefore difficult to see how Missouri's public policy is any less supportive of full faith and credit than it is of full and fair discovery. Consequently, the district court incorrectly used Missouri's

---

[10]In so doing, we acknowledge the contrary authority cited by the appellant on this issue. See, e.g., Howlett v. Rose, 496 U.S. 356, 382 n.26 (1990); Restatement (Second) of Conflict of Laws § 117 (1971) (sister state judgment recognized in other state regardless of the fact that bringing the original action in the recognizing state would offend that state's public policy).

-14-

interest in full and fair discovery to override its interest in giving full faith and credit to a sister state's judgment.

The district court's reliance on the modification argument is also problematic.  The district court found that the injunction was subject to modification in Michigan.  It then held that because the injunction was modifiable in Michigan it need not be given full faith and credit in Missouri, but only the <u>same</u> faith and credit as given by the issuing state's court.  U.S. Const. Art. IV § 1; 28 U.S.C. § 1738.  <u>See also Matsushita</u>, 116 S. Ct. at 877.  However, the mere fact that an injunction remains subject to modification in one state does not render it unworthy of full faith and credit in another.  <u>See</u> Restatement (Second) of Conflict of Laws § 109 (1988 revisions) (judgment entitled to full faith and credit despite fact that it remains modifiable in rendering state).

The full faith and credit clause "is not so weak that it can be evaded by mere mention" of the word "modification."  <u>Howlett v. Rose</u>, 496 U.S. 356, 383 (1990).  This is especially true on facts such as those presented here.  First of all, although the appellees claim that the injunction may be modified by the Michigan court, they presented no evidence that they requested a modification from that court.  Secondly, although it has been asked on several occasions to modify the injunction, the Michigan court has yet to do so.  Thirdly, the district court found that Michigan law required a change in circumstances to warrant modification of the injunction, <u>see</u>, <u>e.g.</u>, <u>First Protestant Reformed Church v. De Wolf</u>, 100 N.W.2d 254, 257 (Mich. 1960), but further found that there had been no "classical" change in circumstances between GM and Elwell in this case.  Therefore, appellees have simply not presented sufficient evidence to show that the Michigan court would modify this injunction.

To avoid its finding of unchanged circumstances, the district court emphasized the importance of other interests, such as the

discovery rights of litigants, of which it believed the Michigan court was unaware when it entered the injunction.[11] <u>Baker ex rel. Cress v. General Motors Corp.</u>, No. 91-0991 (W.D. Mo. June 18, 1993) (reproduced in Addendum to Appellant's Brief at 11). We find no evidence in the record to support such a statement. A stipulation in which GM expressly approved of Elwell's testimony in another case then pending was executed concurrently with the injunction. The Michigan court was, therefore, aware of the existence of at least some other parties' interests. The district court also would have assumed, as did the parties, that other similar litigation would follow; the injunction would otherwise have been unnecessary. Consequently, we find that the appellees failed to establish that the Michigan injunction was not entitled to full faith and credit.

**III.  CONCLUSION**

Because the district court erred in entering a Rule 37 sanction that was too severe and in allowing Elwell to testify, we reverse and remand to the district court for further proceedings consistent with this opinion.

---

[11]The district court also attached some significance to the fact that the GM/Elwell settlement agreement allowed Elwell to testify, without violating its terms, when ordered to do so by a court of competent jurisdiction. The settlement agreement provides, in relevant part:

> It is agreed that [Elwell's] appearance and testimony, if any, at hearings on Motions to quash subpoena or at deposition or trial or other official proceeding, if the Court or other tribunal so orders, will in no way form a basis for an action in violation of the Permanent Injunction or this Agreement.

Settlement Agreement at 10. This language merely shows GM's concession that some courts might fail to extend full faith and credit to the injunction.

A true copy.

Attest:

        CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.